IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MARK WHITE,                              )
                                         )
     Plaintiff,                       )
                                         )
v.                                       )     1:16-cv-670 (LMB/IDD)
                                         )
METROPOLITAN WASHINGTON                  )
    ARIPORTS AUTHORITY,                  )
                                         )
     Defendant.                       )

MEMORANDUM OPINION

Pro se plaintiff[1] Mark White ("White" or "plaintiff") formerly worked as a police officer

for defendant Metropolitan Washington Airports Authority ("MWAA" or "defendant"). His six-

count complaint alleges interference with his rights under the Family and Medical Leave Act

("FMLA") (Count 1); FMLA retaliation and discrimination (Count 2); unlawful medical inquiry

under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("Rehab Act")

(Count 3); removal from duty because of disability in violation of the ADA and Rehab Act

(Count 4); termination because of disability in violation of the ADA and Rehab Act (Count 5);

and retaliation in violation of the ADA and Rehab Act relating to his diabetes, and Title VII of

the Civil Rights Act of 1964 ("Title VII") relating to a complaint of racial discrimination he

made in March of 2015 (Count 6). Plaintiff seeks back pay, front pay in lieu of reinstatement,

and liquidated damages pursuant to 29 U.S.C. § 2617.[2]

---

[1] Plaintiff had counsel at the inception of this civil action, but fired his counsel during discovery.
See [Dkt. 28]. He has proceeded pro se since December 8, 2016.

[2] The Court struck a claim for punitive damages when ruling on the Motion to Dismiss.

Defendant moved for summary judgment as to all counts. On April 14, 2017, in open court, the Court orally granted the defendant's Motion for Summary Judgment, which was fully briefed by the parties. This Memorandum Opinion explains in more detail the reasons for that decision.

## I.      BACKGROUND

MWAA hired White as a police officer in 1988. Def. SUMF, [Dkt. 53] at ¶ 1. White was diagnosed with diabetes mellitus ("diabetes") in 2003 or 2004, and promptly informed MWAA of the diagnosis. Id. at ¶¶ 2, 3. At his deposition, White testified that MWAA required him to take an annual physical "since . . . as long as [he could] remember." Def. Ex. A, [Dkt. 53-1] at 32:22–33:5.[3] Because MWAA does not have in-house medical staff, it has a contract with INOVA Health Systems ("INOVA") to perform the annual physicals. Def. SUMF, [Dkt. 53] at ¶ 8.

When White was first diagnosed with diabetes, he did not pass his annual physical and was not initially cleared for duty. Id. at ¶ 10. This situation was resolved when White's personal physician, Dr. Reginald Wallen ("Dr. Wallen"), later certified that plaintiff was fit to return to work. Id. at ¶ 11. White claims that he delivered the required certification from Dr. Wallen to Major George, an MWAA employee, rather than to INOVA. Def. Ex. A, [Dkt. 56-1] at 78:20–22. According to White, it was "normal procedure" to give such certification letters to the MWAA supervisor. Id. at 199:8–9. White only missed three days of work as a result of this episode. Pl. SUMF, [Dkt. 56] at ¶ 11.

---

[3] In his opposition to summary judgment, plaintiff claimed that he was not required to take a physical from 1996 to 1998 or from 2000 to 2003 or 2004. Pl. SUMF, [Dkt. 56] at ¶ 7.

On March 10, 2015, plaintiff wrote a letter to Bryan Norwood ("Norwood"), who was then MWAA's vice-president for public safety, complaining that the chief of police at the time, Stephen Holl ("Holl"), discriminated against African-American officers. Pl. Ex. 17, [Dkt. 56-17]. The two-page letter alleged that Holl was more tolerant of ethical lapses by white police officers than black officers. Id. The contents of this letter do not reference plaintiff's diabetes. See id.

In early August 2015, Dr. Wallen conducted an annual physical examination of plaintiff, which showed an elevated "A1C level," which is one metric for blood glucose. Def. SUMF, [Dkt. 53] at ¶ 16; Def. Ex. B, [Dkt. 53-2] at 13:17–18. On August 17, 2015, plaintiff met with INOVA's Dr. Vasudha Joshi ("Dr. Joshi") for his MWAA annual physical. Def. SUMF, [Dkt. 53] at ¶ 17. White claims that during that appointment, Dr. Joshi told him that he "passed everything with flying colors." Def. Ex. A, [Dkt. 53-1] at 45:15–17. His fasting blood glucose level that day was 69, which White says is "better than most people that don't even have diabetes." Id. at 46:12–14. Although plaintiff claims that Dr. Joshi said "everything was fine," the record shows that she nevertheless asked to see his A1C level, id. at 46:1–3, and she gave White a form that instructed as follows:

> You must have your personal physician sign the statement at the bottom of the page indicating whether or not you are able to perform the duties required for the job and if you need any restrictions. It is your responsibility to make sure your doctor includes the requested documentation. This report will be incomplete without this information. Please have your physician's office send or fax the completed form. Please note that submitting additional information, or a favorable recommendation from your personal physician, does not guarantee that we will be able to recommend a medical clearance to your employer.

Def. Ex. D, [Dkt. 53-4] (emphasis added). The form also requested that White and his doctor provide "[c]opies of recent physician report, hemoglobin A1c [sic] and any diagnostic tests . . .

3

documenting good control, absence of significant hypoglycemic events and lack of end organ damage." Id.

Dr. Wallen completed the form on September 10, 2015, and returned it to Dr. Joshi. Def. Ex. D, [Dkt. 53-4]. The form shows that Dr. Wallen appears to have scratched out a marking originally made next to the box saying "employee is medically cleared to safely perform the job described above without restrictions." Id. Instead, Dr. Wallen checked the box saying "employee is not medically cleared to perform the job responsibilities as described above," listing White's A1C count, 12,[4] as the reason. Id. As a result of receiving this report, INOVA reported to MWAA that White was not cleared for duty. Def. SUMF, [Dkt. 53] at ¶ 21.

On September 18, 2015, White reported for duty to work overtime, although he was not scheduled for a regular shift that day. Def. Ex. A, [Dkt. 53-1] at 55:9–14. After the roll call, he was approached by a supervisor who told him, "We just got a letter from Dr. Joshi that said that you cannot work." Id. at 55:18–19. They were then joined by another supervisor, Major Naima Reed ("Reed"), id. at 55:18–22, who gave White a copy of the form signed by Drs. Wallen and Joshi indicating that he was not cleared for duty, id. at 56:4–6. Reed informed White that he did not "have to go home" that day, and could instead "just work the desk." Id. at 56:11–13. White responded, "[N]o, I'm going home. . . . I didn't come here to work today, I didn't sign up to work the desk, I'm going home." Id. at 56:13–17. White claims he made that decision to leave because he was only there to work overtime and there was "no need" for him to work the desk,

---

[4] Other exhibits suggest that plaintiff's A1C count at this time was actually 12.4. See Pl. Ex. 14, [Dkt. 56-14] at 2.

even though he acknowledges that he would have been compensated at the same rate for working the desk. Id. at 56:18–57:2.[5]

In her deposition, Reed described having a more lengthy conversation with White on September 18:

> I informed [White] on the 18th that if you were denying to work in a modified duty status based on your interim report from Dr. Joshi that [White] would be placed on FMLA.
> [White's] response to me was that [he] had enough leave to take, so [he was] fine with FMLA. [He was] also aware of what FMLA was at the time, because I explained that to [him] as well as I explained the modified duty procedures. And [he] agreed to that because [he] said [he] had enough leave and that [he was] going to spend some time with [his] mother or something to that nature.

Def. Ex. F, [Dkt. 56-6] at 18:8–19. Reed also recalls that on September 18 White handed her a document from Kaiser, where Dr. Wallen works, and that she "told [him] specifically that any documentation that [he] had from [his] physician, that [he] needed to give that to Dr. Joshi." Id. at 11:7–11. Reed did not read or understand the document that White handed her that day. Id. at 11:11–14.

White did not return to work after September 18, 2015. On September 21, 2015, he obtained a letter from Dr. Wallen stating, "You are fit for duty if your A1C of 9.3 is medically acceptable per guidelines for your employer, state and federal recommendations." Pl. Ex. 4, [Dkt. 56-4]. There is no evidence in the record of White submitting that letter to Dr. Joshi.

On September 23, 2015, MWAA sent White a letter informing him that he had been placed on FMLA leave effective September 23, 2015. See Def. Ex. H, [Dkt. 53-8]. The letter

---

[5] This account is from White's deposition testimony. In his opposition to summary judgment, White claims that he "did not meet Major Reed on September 18, 2015 or any other date" and never received any documentation from her. Pl. SUMF, [Dkt. 56] at ¶ 23.

informed White that he had twelve weeks of FMLA leave available, but did not mention that he would be required to provide medical certification before he could return to work. See id.

The FMLA designation letter included an attachment, which contained guidance about FMLA leave for employers and employees. Pl. Ex. 6, [Dkt. 56-6]. On the last page of the "Employee's Guide," the following question and answer appeared:

> Q: After I have used my 12-weeks of FMLA and want to come back to work, can my supervisor require certification of physical/medical ability to do the work? A. Yes. However, your health care provider must provide the certification and you must be notified by your supervisor in advance that this certification will be required. Once received, if your supervisor has any questions or concerns about the certification, and receives your permission, the Office of Human Resources will consult with an occupational medical provider who will review it and who may consult with your personal physician if needed.

Id. at 3-7 (emphasis in original). The enclosure then provided a contact number for additional information. Id.

On September 24, 2015, White wrote to Norwood, then MWAA's vice-president for public safety, complaining that he had been discriminated against on the basis of his diabetes. White purported to cite a publication of the American Diabetes Association, although he has not provided the original document, claiming that it said, "An A1C cut-off score is not medically justify [sic] in employment evaluations and should never be the sole basis for an employment decision" because "A1C . . . results are of no value in predicting short-term complications of diabetes." Pl. Ex. 5, [Dkt. 56-5] at 1. White attached a copy of Dr. Wallen's September 21 letter, stating that his A1C was now 9.3. Id. at 2. It is undisputed that he did not send that letter to INOVA.

On October 15, 2015, White wrote a letter to Susan Carrol ("Carrol"), Chief Executive Officer of INOVA, claiming that Dr. Wallen initially cleared him for duty, but changed his finding when Dr. Joshi informed him that an A1C level of 12 was too high. Pl. Ex. 14, [Dkt. 56-

14] at 2. White also claimed that his A1C as of September 18 was in fact 9.2, although he did

not say he was attaching a copy of Dr. Wallen's September 21 letter, and there is no evidence in

this record that he included the letter. See id.

White allegedly called Mike Leyva ("Leyva") on the telephone,[6] who told White that

there had "been a misunderstanding" and that "Dr. Joshi [was] going to send [him] a letter that

will clarify the thing [and] tell [him] what's wrong." Def. Ex. A, [Dkt. 56-1] at 72:4–8. Leyva

told White to "just wait at [his] house" and that the letter was on its way and "would explain

everything." Id. at 72:8–10.

On October 27, 2015, White received another medical authorization form sent by

INOVA. This form was substantially identical to the form he had been given in September, and

stated:

> Your medical examination performed on 8/17/15 for your position as a police
> officer was significant for: poorly controlled [diabetes]. Unless your personal
> physician can provide more information about this condition by 12/18/15, we will
> not be able to complete the medical determination for your employer.

Def. Ex. J, [Dkt. 53-10]. The letter instructed White as follows:

> You must have your personal physician sign the statement at the bottom of the
> page indicating whether or not you are able to perform the duties required for the
> job and if you need any restrictions. It is your responsibility to make sure your
> doctor includes the requested documentation.

Id. Once again, the letter specifically requested documentation of recent physician reports and

A1C tests. Id.

Rather than following this very clear instruction, White called both Drs. Joshi and Wallen

on the telephone. Def. Ex. A, [Dkt. 53-1] at 80:2–13. When asked at his deposition why he did

not take the INOVA form directly to Dr. Wallen, White testified:

---

[6] The record is not clear about what position Leyva holds.

Because I called Dr. Joshi when I received this, I called her, because I was given the impression that she was going to call me and explain to me the nature of my illness, why I could not go back to work. Mr. Leyva had already told me on the phone that it was a misunderstanding, Dr. Joshi was going to explain to me the nature of my illness and what I need to receive. This [form] does not explain the nature of my illness.

When I received this, I called Dr. Joshi and I asked her, what is this that you're sending me, I was expecting you to tell me what's wrong with me. She said, you're going to—she just was rude again, you're going to be out of work until December, and hung up the phone.

I called Mike Leyva and talked to Mike Leyva. I said, what is this, you told me that it was—he said, hey, look, Dr. Joshi didn't do anything wrong, and hung up the phone. So I kept calling him back and no one never answered the phone [sic].

So I didn't know what this [form] is, no one ever explained to me what I need to do with it. I said, this is what—I've already got this, this is the same thing, this has already been filled out before, why are you sending me the same thing.

Id. at 74:1–75:4.

White further testified that he was confused about what he was supposed to do with the

second medical authorization form when he was asked a second time why he did not take it to

Dr. Wallen immediately:

If [Dr. Joshi] had given me this when she gave me this and telling me you need this form filled out today, I would have been back to work on the 21st anyway. Why wait—and then she also stated that I would be back to work on—look right here, on December. Why are you sending me a form on October the 27th telling me I'll be back to work on December, if my doctor—even if my doctor cleared me to go back to work, I'll be back to work in December? I mean, she could have sent me this the same day that she—when they told me that I could not work on the 18th, she could have attached this with it, and I would bring this as well as my clearance to go back to work on the same day. Why did she need to put on here that I could not go back to work until December the—until December?

Id. at 75:13–76:6

On November 18, 2015, plaintiff sent a letter to John Potter ("Potter"), President and

Chief Executive Officer of the MWAA, Pl. Ex. 11, [Dkt. 56-11], in which he once again

complained that he had been the victim of diabetes discrimination and discussed his complaints about racial discrimination in the department. Id. at 4.

On December 22, 2015, the then-acting chief of police Brian Norwood ("Norwood") sent White a letter stating:

> You are hereby advised that you have failed to comply with the request from the Airports Authority's Medical Director, at INOVA, to provide information as a follow up to your most recent physical examination. Currently the [MWAA] Police Department is unable to verify your fitness for duty because of your failure to provide the required information. You have been reminded several times of the December 22, 2015 deadline for submission of the required information from your treating physician, most recently on August 17, 2015. Your continued failure to provide this information constitutes a disobeyal of orders.

Def. Ex. K, [Dkt. 53-11]. The letter informed White that he had to provide any documentation by January 5, 2016. Id. There is no evidence in the record that White did not receive the December 22, 2015 letter.

On January 20, 2016, White finally obtained Dr. Wallen's signature on the form that he had received on October 27. Def. Ex. O, [Dkt. 53-15]. That form now indicated that he was cleared for duty. Id.

On January 21, 2016, Scott Booth ("Booth"), who had taken over as chief of police, sent White a letter advising White that he still had not provided the documentation requested in the October 27 form and the December 22 letter. Def. Ex. M, [Dkt. 53-13] at 1. As a result, Booth informed him that as of January 26, 2016, White would have "exhausted [his] sick and annual leave as well as [his] 12 weeks of FMLA entitlement." Id. The letter concluded:

> In view of your failure to provide the required documentation to INOVA, the exhaustion of both FMLA and all leave balances, and your rejection of a modified duty assignment,[7] as of January you will be in an Absence Without Leave

---

[7] Plaintiff disputes that he was offered a modified duty assignment for any day other than September 18, 2015.

(AWOL) non-pay status. . . . Your continued absence due to your refusal to submit the required documentation will subject you to disciplinary action.

Please provide Major Reed notice, by telephone or by email, when you have submitted the required documentation to INOVA. If you do not provide the required documentation to INOVA by 4 pm on January 29, 2016, you will be promptly issued a proposal to terminate your employment.

Id. at 2. White did not submit Dr. Wallen's form, which was signed on January 20, 2016, to INOVA by the January 29 deadline. Def. SUMF, [Dkt. 53] at ¶ 34. Because White had "not consistently [been] residing at the address provided to MWAA," and no one was available to sign for the letter on any of the three occasions on which FedEx attempted to deliver it, plaintiff did not receive Booth's letter until it was hand delivered to him on February 10, 2016, by internal investigator Lieutenant Angela King ("King"), who met with plaintiff to discuss his failure to comply with the multiple directives to file the requested medical form with INOVA.[8] Def. Ex. Q, [Dkt. 53-17] at 6:7–20; Def. Ex. P, [Dkt. 53-16] at 2–3. The very next day White submitted the medical clearance form signed by Dr. Wallen to INOVA. Def. SUMF, [Dkt. 53] at ¶ 34.

On February 12, 2016, Booth sent White a letter formally notifying him that he was the subject of an internal affairs investigation regarding his failure to comply with the instructions to provide documentation of his medical clearance to work. Def. Ex. N, [Dkt. 53-14]. The letter informed White that his police powers were suspended effective immediately, and that he was to be placed on administrative leave during the pendency of the investigation. Id.

The investigation was completed on March 28, 2016, when King filed her report. The report described the sequence of events recounted above. Def. Ex. P, [Dkt. 53-16] at 2. The report concluded:

---

[8] King's deposition testimony puts this date on February 9, but contemporaneous documentation shows it to be February 10. See Def. Ex. P, [Dkt. 53-16] at 3.

On January 26, 2016 Cpl. White had exhausted all of his annual leave, sick leave [sic]. His 12 weeks of FMLA had also expired. Supervisors attempted to contact Cpl. White on numerous occasions. Cpl. White's voice mail box did not accept messages when attempts to contact him via telephone were made. By his own admission he was not residing at the residence . . . his supervisors had for him on file. He did not provide an alternate address. By exhausting all of his leave and failing to communicate with his supervisors at MWAA, Cpl. White was Absent Without Leave non-pay status. This was due to Cpl. White's refusal to provide the proper documentation for his medical clearance. Cpl. White's continued absence constitutes abandonment of his position.

Cpl. White had the inherent responsibility to provide documentation as directed, a procedure that he had been familiar with since 2004 and to come to work. At a minimum, [he had to] maintain communication with his supervisors. Cpl. White failed to meet any of the aforementioned criteria.

Id. at 4.

On April 4, 2016, Norwood sent White a notice of proposed removal, which was also signed by Scott and witnessed by King. Def. Ex. R, [Dkt. 53-18] at 1, 3. The letter provided two reasons for removing him: his failure to follow "law, regulations and orders" by not providing the required documentation in a timely fashion and for being absent without leave. Id. at 1–2. On April 22, 2016, Scott sent White a letter informing him that "[a]fter reviewing the Internal Affairs file, it [was his] decision to terminate [White's] employment." Def. Ex. S, [Dkt. 53-19].

White filed a grievance with Norwood and was represented in the grievance process by union official Lajacqueline Biggers. Def. Ex. T, [Dkt. 53-20]. On June 23, 2016, Norwood denied White's appeal and upheld the termination decision. Id.

## II.    DISCUSSION

A. Standard of Review

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323,

324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

Where the nonmoving party bears the burden of proof, the party moving for summary judgment may prevail by showing "an absence of evidence to support" an essential element of that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322–25 (1986); see also Rhodes v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir. 2011). Once the moving party has successfully demonstrated that absence, the nonmoving party must "come forward with specific facts," rather than "metaphysical doubt[s]" or conclusory allegations, that prove that there is a genuine dispute for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotations omitted); see also Erwin v. United States, 591 F.3d 313, 319 (4th Cir. 2010). Failure to do so "renders all other facts immaterial" and entitles the movant to judgment as a matter of law. Rhodes, 636 F.3d at 94.

Under Fed. R. Civ. P. 56(c), "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." The court must "draw

any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

When a plaintiff is proceeding pro se, pleadings are "to be liberally construed." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Nevertheless, "[t]he 'special judicial solicitude' with which a district court should view . . . pro se complaints does not transform the court into an advocate[.]" Weller v. Dep't of Soc. Servs., 901 F.2d 387, 391 (4th Cir. 1990).

### B. FMLA Interference (Count 1)

To prevail on a claim for FMLA interference, an employee must "demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm." Adams v. Anne Arundal Cnty. Pub. Sch., 789 F.3d 422, 427 (4th Cir. 2015).

The FMLA gives an employee the right to take 12 work weeks of leave during a 12-month period when the employee suffers from a "serious health condition" that leaves the employee "unable to perform" his job. 29 U.S.C. § 2612(a)(1)(D); Adams, 789 F.3d at 426. "When returning from FMLA leave, an employee is also entitled to be restored to his previous position or an equivalent position, so long as he would have retained that position or an equivalent one absent the taking of leave." Adams, 789 F.3d at 426.

Department of Labor regulations permit an employer to "have a uniformly-applied policy or practice that requires . . . employees . . . who take leave for [serious health] conditions to obtain and present certification from the employee's health care provider that the employee is able to resume work." 29 C.F.R. § 825.312(a). "An employer may delay restoration to

13

employment until an employee submits a required fitness-for-duty certification unless the employer has failed to provide" notice of such a requirement in the FMLA designation letter provided to the employee at the outset of leave. Id. at §§ 825.312(e); 825.312(d); 825.300(a). When an employer fails to comply with the notice requirements, it "may be liable for compensation and benefits lost by reason of the violation, for other actual monetary losses sustained as a direct result of the violation, and for appropriate equitable or other relief[.]" Id. at § 825.300(e). If the failure to comply with the notice rules prolongs an employee's reinstatement, then the violation has prejudiced the defendant. Rutherford v. Peoria Pub. Sch. Dist. 150, __ F. Supp. 3d __, 2017 WL 150500, at *6 (C.D. Ill. 2017) ("Simply put, the District's failure to follow the FMLA notice rules, . . . prolonging [plaintiff's] reinstatement process, prejudiced Rutherford because it kept him from returning to work despite the fact that he wanted to, was fit to do so, and was entitled to do so.").

It is undisputed that the FMLA designation letter sent by the MWAA did not contain any reference to a fitness-for-duty certification and therefore was not in compliance with 29 C.F.R. § 825.312(d).[9] Plaintiff argues that he was prejudiced by this failure because this deficient notice did not adequately explain the fitness-for-duty certification requirement.[10] Defendant argues that plaintiff was not prejudiced because he was sufficiently informed about his obligation to provide INOVA with the necessary certification.

_____

[9] Defendant has not argued that the enclosed "Employee's Guide" satisfied the notice requirement.

[10] Plaintiff also argues that he was forced to take FMLA leave unnecessarily. Although the Fourth Circuit has not explicitly recognized an "involuntary leave" theory under the FMLA, those circuits which have recognized such a claim permit it only if the employee is later denied leave to which he is entitled. See Leonard v. Electro-Mechanical Corp., 36 F. Supp. 3d 679, 691 (W.D. Va. 2014) (collecting cases). Plaintiff therefore cannot prevail under such a theory, because he has not alleged that he later requested leave that he was denied.

Even viewing the facts most charitably to the plaintiff, it is clear that he was not prejudiced by defendant's failure to provide clear notice in the designation letter. Plaintiff had known for years that he had to pass an annual fitness for duty medical examination, and just one week before he was put on FMLA leave in September 2015, he had gone through the process of obtaining medical certification from INOVA. The September 2015 fitness-for-duty form from INOVA clearly instructed White to have his personal physician complete the form and return it to INOVA. This experience put White on notice that he needed to go through the same process when he was told one week later that his doctor had determined that he was not fit for duty.

Even if White was not on notice as of September 2015, any deficiency was cured when he received the October 27, 2015 form from INOVA, which clearly advised him that it needed his "recent physician report," including A1C test results, and instructed him to "have [his] physician's office send or fax the completed form" to INOVA. Def. Ex. J, [Dkt. 53-10]. This written instruction, combined with his successfully completing an identical form just one month before, demonstrates that White knew what information MWAA was seeking, how he had to submit that information to INOVA, and that he was on fair notice of these requirements months before he exhausted his annual and FMLA leave.

White testified at his deposition that even after October 27, 2015, he genuinely did not understand what he was supposed to do to obtain a fitness certification or why he was being asked to fill out the same form as in September. As evidence for this claim, he points to his communications with Norwood and others throughout the fall in which he claimed that he was fit for duty, arguing that these communications show he was willing to provide the required information if he had known the proper channel. Contrary to plaintiff's argument, those communications do not demonstrate a reasonable effort to comply with MWAA's fitness-for-

duty certification request; rather, they were primarily ad hominem attacks on Dr. Joshi for

reporting that he was unfit for duty in the first place. For example, in his September 24 letter to

Norwood, plaintiff wrote, "The reasoning that Dr. Yoshi is using to indicate that I am not able to

perform my duties as a police officer is totally illegal and without merit. Her action is callous

and cowardice [sic] and lack the support [sic] of any government regulation or medical

procedure." Pl. Ex. 5, [Dkt. 56-5] at 1. In his six-page November 28, 2015, letter to the CEO of

MWAA, he complained of an "unethical chain of events" leading to his suspension and claimed,

"Dr. Joshi in all of her infamous wisdom and duplicities does not fully understands [sic] the

medical ramifications of her frivolous inquiry about my diabetes." Pl. Ex. 11, [Dkt. 56-11] at 1.

He concluded that the real reason for INOVA's request for more information about his A1C

levels was his complaint about Holl's alleged racial discrimination:

> Dr. Joshi and MWAA need to stop playing this silly game of pretending to need
> information about my diabetes before they can complete my physical
> examination. This is a false claim and a ruse used to inundate my mind with
> fodder that has nothing to do with the real issues at hand. . . . The real issue here
> is that MWAA is retaliating against me for writing a letter against Chief Holl and
> Lt. Webster, and the fact that they were trying to use my well documented history
> of having diabetes as a mean [sic] to punish me is discrimination.[11]

Id. at 5. These letters do not show that White was genuinely confused about how to obtain

certification of his fitness for duty; rather, they demonstrate that he was trying to dispute Dr.

Joshi's medical judgment that based on his A1C level as reported in September 2015 he was

unfit for duty. Accordingly, the letters do not support White's claim that his misunderstanding

of the fitness certification procedure caused his delay in submitting the required information

from Dr. Wallen.

---

[11] There was no evidence in this record establishing or even suggesting that Dr. Joshi was aware
of any comments plaintiff had made to MWAA officials about alleged racial discrimination,
other than plaintiff's unsupported allegations.

Because the record clearly demonstrates that White was on notice about how to obtain a fitness-for-duty certification which would have enabled him to return to work, he has not shown that he was prejudiced by the MWAA's failure to include notice of that requirement in his FMLA designation letter. Accordingly, he cannot prevail on his interference claim and defendant is entitled to summary judgment on Count 1.

## C. FMLA Retaliation and Discrimination (Count 2)

"Retaliation claims brought under the FMLA are analogous to those brought under Title VII." Adams, 789 F.3d at 429. "Plaintiff must prove three elements to establish a prima facie case of retaliation: (1) [h]e engaged in a protected activity; (2) [his] employer took an adverse employment action against [him]; and (3) there was a causal link between the two events." Id. (internal citation and quotation marks omitted). "If the defendant advances a lawful explanation for the alleged retaliatory action, the plaintiff must demonstrate that the defendant's reason for taking the adverse employment action was pretextual." Id.

There is no evidence in the record to support an inference that White was fired because he took FMLA leave. White was permitted to use his entire 12 weeks of FMLA leave without interruption or complaint from MWAA. There is also no evidence that anyone at MWAA ever made a single negative comment about White's decision to take FMLA leave. Every document produced by the defendant relating to White's termination indicates that he was fired for two reasons: failure to follow orders to provide the appropriate doctor reports related to his fitness for duty certification and his AWOL status after his FMLA leave had expired. Without any evidence to undermine those stated reasons, plaintiff has not produced any evidence of a causal

link between taking FMLA leave and the termination decision and summary judgment is appropriate on Count 2.[12]

### D. ADA/Rehab Act Unlawful Medical Inquiry (Count 3)

A threshold question in the ADA and Rehab Act claims is whether White's diabetes constitutes a disability. Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of an individual," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). Under the Rehab Act, "disability" means "a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment." 29 U.S.C. § 705(20)(A). Defendant argues that White has not produced evidence satisfying those standards, but this argument cannot be squared with the defense's contention that White was, at least temporarily, unable to perform some of his job functions as a result of his illness. Accordingly, White has demonstrated that he was "disabled" under the ADA and Rehab Act.

The ADA provides that an employer "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(4)(A).[13]

Throughout these proceedings, White has maintained that inquiring into his A1C count was not "job-related" or "consistent with business necessity" because it is a long-term measure of blood sugar and does not tell the employer anything about his present fitness for duty. In

---

[12] For the same reasons, plaintiff could not establish that defendant's proffered reasons were pretextual even if he could satisfy the prima facie case.

[13] Plaintiff has not identified a similar provision of the Rehab Act, and the Court cannot locate one.

letters and testimony, White has repeatedly cited guidance from the American Diabetes Association claiming that an A1C count "should never be the sole basis for an employment decision." Pl. Ex. 5, [Dkt. 56-5] at 1. But White has not produced any admissible evidence to support this contention. The cited guidance is hearsay, because White has not produced it in its original form, and he has not provided any expert testimony to support this theory. Although his assertions are informed by his experience as a patient, without more they are not sufficiently reliable to be presented to a jury. See Fed. R. Civ. P. 702; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). Indeed, White's own doctor testified that an A1C level of 12 "puts the patient's health [and safety] at risk." Def. Ex. B, [Dkt. 56-2] at 15:2–4. Without any record-based support for his position that the inquiry about his A1C level was not business related, White's unlawful medical inquiry claim does not survive summary judgment.

E. ADA/Rehab Act Removal From Duty and Termination Because of Disability (Counts 4 and 5)

The ADA and Rehab Act prohibit an employer from taking a discriminatory adverse action against a disabled person. Reyazuddin v. Montgomery County, Maryland, 789 F.3d 407, 413–14 (2015). Claims under both Acts are evaluated using a substantially similar framework. Id. To make out a prima facie case on a claim of discrimination, a plaintiff must show that he "(1) has a disability; [and] (2) is otherwise qualified for the employment[.]" A Rehab Act plaintiff must show that the employer took an adverse action "solely because of" the plaintiff's disability, whereas an ADA plaintiff must simply show that the adverse action was "because of" the disability. Id. at 418; E.E.O.C. v. Stowe-Pharr Mills, Inc., 216 F.3d 373, 377 (4th Cir.

2000).[14] If these elements are shown, the burden shifts to the defense to articulate a legitimate, non-discriminatory reason for the adverse action. Id. at 419 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). "If the defendant meets this burden of production, the presumption created by the prima facie case 'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that [he] has been the victim of intentional discrimination." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995).

It is a defense to a charge of discrimination if the employer applies a "qualification standard . . . that . . . has been shown to be job-related and consistent with business necessity," including a requirement that "an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113.

Plaintiff has raised two adverse employment actions: his removal from duty in September 2015 and his termination in April 2016 (which was sustained in June 2016). Regarding his termination, there is no evidence that his termination was "because of" his diabetes. Rather, just as with his FMLA discrimination claim, MWAA has consistently stated and the evidence establishes that the termination decision was based on plaintiff's failure to follow orders to submit requested documentation and his AWOL status. Plaintiff has not provided evidence that anyone at MWAA harbored any animus toward him because he suffered from diabetes, and has even testified that he did not feel that anyone treated him differently because of his diabetes before September 18, 2015. See Def. SUMF, [Dkt. 53] at ¶ 4; Pl. SUMF, [Dkt. 56] at ¶ 4. On this record, plaintiff cannot make out a prima facie case of disability discrimination regarding his termination, much less establish pretext.

---

[14] In other words, the ADA permits so-called "mixed motive" discrimination claims, but the Rehab Act does not. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 n.17 (4th Cir. 2005).

As for the removal from duty claim, defendant does not dispute that on September 23, 2015, White was removed from his law enforcement duties because of his diabetes.[15] Rather, it argues that the A1C requirement it imposed was a permissible qualification standard designed to ensure health and safety in the workplace. Although plaintiff disputes the value of the A1C test for determining the risk he posed in the workplace, as discussed in Part II.D above, he has no admissible evidence to support that contention. The defense, on the other hand, has presented evidence from White's personal physician that elevated A1C levels can pose health and safety risks. On this record, the undisputed admissible evidence indicates that a threshold A1C level is therefore "job-related" and "consistent with business necessity" when the position requires carrying a firearm. Accordingly, defendant is entitled to summary judgment on Counts 4 and 5.

F. ADA/Rehab Act/Title VII Retaliation (Count 6)

The ADA, Rehab Act, and Title VII prohibit retaliation against a person who engages in protected activity. To establish a claim for retaliation, a plaintiff must first make out the prima facie case: "(1) [he] has engaged in protected conduct; (2) [he] suffered adverse action subsequent to engaging in the protected conduct; and (3) there was a causal link between the protected activity and the adverse action." Perry v. Computer Sci. Corp., 429 F. App'x 218, 219 (4th Cir. 2011) (ADA and Rehab Act) (internal citation and quotation marks omitted); Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (Title VII) (4th Cir. 2015).

In a Title VII retaliation claim, causation must be shown "according to traditional principles of but-for causation." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013). If the plaintiff relies solely on the proximity in time between the protected activity and

---

[15] Although White was not permitted to take on law enforcement duties, defendant's evidence is that he was offered the opportunity to work a desk job at the same rate of pay, but he refused the opportunity to do so.

the adverse action to establish causation, a lengthy gap in time will ordinarily defeat such an inference. See Clark Cnty. School Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation.").

Once again, the burden shifting framework applies, meaning it is the plaintiff's burden to show that a legitimate, non-retaliatory reason for the adverse employment action proffered by the defendant is in fact a pretext for discrimination. Foster, 787 F.3d at 246; Perry, 429 F. App'x at 219.

White's March 10, 2015, letter regarding Holl's alleged disparate treatment of African-Americans constituted Title VII protected activity, and his various letters in the fall of 2015 protesting his removal from duty constitute protected ADA or Rehab Act protected activity. Nevertheless, he cannot satisfy the causation requirement of any of these acts.

His Title VII claim fails because he is relying exclusively on the proximity in time of the letter protesting Chief Holl's actions and his being fired, but the decision to terminate him was made over a year after he sent the letter, a time period that is too long to support a causal inference under Causey. 162 F.3d at 803.[16]

His ADA and Rehab Act retaliation claims fail because, as with the discrimination and FMLA retaliation claims, there is simply no evidence to support an inference that the protected activity, rather than the MWAA's belief that White was disobeying orders and AWOL, was the reason for his termination. Accordingly, White cannot show that his protected activity was the

---

[16] Although White mentioned these complaints in his letter to Potter, MWAA's CEO, in November of 2015, there is no evidence that Potter was involved in the decision to terminate White.

cause of his termination or that the defendant's proffered reasons were pretextual. For these reasons, the defendant is entitled to summary judgment on Count 6.

### III.     CONCLUSION

For these reasons, in addition to those stated in open court, the defendant's Motion for Summary Judgment [Dkt. 52] was granted on April 14, 2017, as to all counts.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record and plaintiff, pro se.

Entered this 5 day of May, 2017.

Alexandria, Virginia

_____ /s/ 

Leonie M. Brinkema
United States District Judge